was standing up from his chair, going like this with his hands on the table, screaming almost. Now, the record doesn't show that. The record just shows his words, but his actions, which aren't there, judges, show that he had bias. I do think that this case differs from other cases because this was public. The public was really seeing this judge act out of anger. I don't think my client had a fair trial. The government does not say in the brief that the judge was angry. But obviously, as I just said, it doesn't show that he was shouting, that he was standing, menacing with his hands to my client. That is one issue that I think should bring forth a new trial. The other issue, judges, is that there was evidence in this case, as to my client, of actions that were called at that time rounds. Rounds meant looking out for people, kidnapping them, beating them. Those rounds were never tied up to the case. In fact, the government doesn't even know who those men are. They just know what was told to them by the witness. But the names or when it did happen, nobody ever knew. The witness specifically stated, those were not drug matters. What they were, nobody knows. Nobody knows if it was a fight, if it had to do with money, women, some other things that were not part of the drugs that were charged. Counsel, at this point, I'm going to ask Judge Torea if he has a question for you. I have no questions. All right. Would you like to finish that point? Yes, I would. Go ahead. We learned about those rounds beginning trial. We asked the judge not to let that go in. It was not admitted at all for any part of this trial. Those rounds, what they meant was that my client was a bad guy, cruel, vicious, but nobody knew whatever happened with those rounds. That is all, Your Honors. Thank you. Good morning. May it please the Court. My name is Jeremy Gutman. I represent Appellant Christopher Laureano Perez. In our brief, we discussed a multitude of errors and improprieties that deprived Mr. Laureano of a fair trial. Among these was overview testimony, which is a subject that this Court has, for at least a decade, written case after case admonishing prosecutors, telling them that it's improper, it's unfair. Even in a case where all it does is say the same things that cooperating witnesses ultimately say, it still has an improper effect because it's as if the government is vouching for it. Are you conceding with that argument that what the so-called overview witnesses said was in fact supported by evidence adduced later in the trial? No, Your Honor. It went far beyond that. What was the evidence that the quote, overview witnesses testified to which was not supported by testimony later? The first, he wasn't the first witness in the trial, but the first one who gave evidence relevant to all of the defendants, Officer Vasquez told that he identified my client as a leader. He identified a person as a trigger man, and there was no evidence of that from any of the witnesses. The witnesses said in very vague ways that my client was a leader, although they didn't give specifics about how they knew that. They said that's what everybody said. The information about the armed escort was based on hearsay, completely improperly placed before the jury. And in addition to that, the government, I think, did a variation that went beyond anything that's appeared in any of the cases where this court has previously addressed this kind of thing. They, in effect, had an agent who was called as a defense witness to answer one single question about a prior inconsistent statement of a witness. The answer called for nothing beyond reading his prior interview notes. On the pretext of giving context to that and with the encouragement of the court, he said everything that this witness said was corroborated by other intelligence. He did not identify that intelligence. We have no idea. Basically, he said, trust us. And this sort of was combined with the court communicating also in a way that this court has frequently admonished against his view that the law enforcement agents should be trusted just because they were law enforcement agents. Okay. I didn't mean to distract you from the main points of your argument. Do you want to just preview them for us? The first is overview testimony. Yes, Your Honor. Well, there was the overview testimony particularly by those two witnesses. The comments by the court. Who was the second one? The second one was Officer Adams. Adams. Who essentially testified to nothing but hearsay and said that everything that you've heard has been corroborated by our investigation, not by any evidence that was presented in court. There were comments by the court that essentially indicated the court's assumption that the organization charged, alleged in the indictment, existed. So he asked questions in a way that presumed the existence of the organization. And he, on a number of occasions, allowed law enforcement officers to testify as experts without any qualification and said things to the jury such as he's been on the police force for a number of years. He knows what he's talking about. Again, this court has been very clear that courts have to be very careful, because of the great weight that they hold in the eyes of the jury, that they not say anything that could suggest a view one way or the other. Here that happened, and here, as we point out in more detail in the brief, the instructions really didn't, which this court has held, are not necessarily enough to cure it, even if they're the right instruction. Here the instruction wasn't disregard everything that I said. It was your liberty to disregard, meaning you don't necessarily have to. The government responds to this by suggesting that there was overwhelming evidence against my client, but I invite them to point to specific evidence that shows, because they refer to evidence about people running from apartments where there were guns and drugs found during seizures. They cannot point to any evidence that my client was involved in any of that. If that's a sufficiency of the evidence argument, the burden is now on you to show that no jury could possibly have concluded, based on the evidence, that your client was guilty. Your Honor, I appreciate that. I'm not arguing sufficiency of the evidence. My point is that, contrary to the position taken by the government, the improprieties that we've laid out, including the overview testimony and the comments of the judge, and also the allowing of completely irrelevant testimony that was about bad acts that were never connected to the charges in the indictment, which my co-counsel has spoken about to some degree, there were at least three different incidents. In fact, the entire trial was much more about things that weren't relevant to the indictment than about things that were. There was a very small part of it, two witnesses who gave very vague testimony that really said anything about my client. And the reason I bring up the strength of the evidence is to respond to the government, who argues that these improprieties didn't have any effect because there was such strong proof of guilt. I invite the government to point out any evidence other than the complaining witnesses and this improperly admitted evidence that concerned, that was directly about Mr. Loreanna. And with regard to the testimony of the complaining witness, Rivas, who testified about efforts to retaliate against individuals, the government, in their brief, argues that the connection to the drug conspiracy can be found by looking at the government attorney's proper statement outside the presence of the jury. And clearly, that misses the point and proves our point, that this was evidence that was not connected to the conspiracy. The government's proffer, obviously, is not evidence. That may be what they believe, but they did not present any evidence to connect it. So, in the absence of that, it's nothing but improperly admitted evidence to show a propensity to engage in wrongdoing. And we challenge the government's suggestion that there was any evidence whatsoever. Wouldn't it matter if the same people were involved? In other words, take your point that it's related to a different conspiracy or different, but the same cast of characters are involved. The same cast of characters are involved. Why wouldn't it be potentially relevant just to show the relationship? Well, it was not offered for that purpose. That wasn't the position taken below. But the evidence itself was, particularly as it relates to my client, it was like there was nothing more than the witness claiming that he had been told by someone else that my client wanted this to happen. So, it was really not probative of much of anything other than to suggest involvement in violent actions. And the presentation of this in the context of the entire testimony, which was just completely with the real evidence, I mean, the evidence about anything to do with the drugs. And by the way, my client acknowledged an association with these people. So, the fact that he was associated was not an issue. I think in his opening statement he acknowledged that. And he said he'd grown up with these people, he'd known them for a long time. There was actually evidence that he went to this location where drugs were sold to purchase drugs, which we submit further weakens the government's case because it's inconsistent with the idea that he owns the drugs, since he's the leader of this organization, and yet he's purchasing drugs. There was also evidence that he ran a construction business, which again, and that some of the people who testified, one of the complaining witnesses. This is all relevant to the prejudice point or to the relevancy of the? I think to both. I think the weakness of the evidence and the fact that they overcame, you can't say that it was harmless error in the face of such a thin case and where there was a plausible explanation for my client's association with the individuals there. There was evidence inconsistent with him being a leader of this organization. And in that context, having a law enforcement officer say, don't worry, we've corroborated it through our investigation, and we can't show you that evidence, but we did it out of court. Can I ask you about the exclusion of the children from the courtroom and what your response is to why that argument wasn't waived by not raising the objection below? Well, Your Honor, well, as to the first part of it, it had already become a state of conflict before it was even brought to the attorney's attention. As to the failure to ask for a remedy once that happened, I agree that that was not preserved by an objection. Well, I'm asking something different, not whether it's preserved. Does that mean you agree that it was waived? I guess there's a difference between waiver. I don't know that it was affirmatively waived. Well, that's what I'm asking. What's your response to the argument that it was affirmatively waived? I understand that it wasn't preserved in the sense that maybe plain error applies. You argued in your brief that even under plain error, you'd win. So I'm asking, what's your argument for why it wasn't waived? Because a waiver, especially of an important constitutional right, requires an affirmative statement. I hereby waive. It can't be presumed based on silence. This particular issue about exclusion from the courtroom or the denial of the right to a public trial very often has come before the court in the context of a habeas petition, where it was raised for the very first time after the trial, and this court has nonetheless recognized it as a waiver. In Acosta-Cologne, it looks like we treat it as waived, a situation quite similar to this where there was no affirmative mention of the constitutional right or anything. What's your response to that? Yes, Your Honor, I would suggest that to the—I'm not fully familiar with that case, Your Honor, but I would argue that where we're talking about a fundamental constitutional right that's been recognized for at least the last 40 years— That's merely an argument that you consider the right so important that it cannot be waived. I'd like to ask Judge Torea if he has any questions. Yes, I have a couple of questions, counsel. As I understand it on this endorsement of testimony issue, there was no objection as to Officer Vasquez's testimony, am I correct? Yes, Your Honor. There was objection as to Agent James' testimony at the end of the trial? Yes. Now, is it not true that the record shows that Officer Vasquez engaged in surveillance throughout all this time? Yes, Your Honor. Yes, but his testimony went beyond merely summarizing the things that he could see on the videotapes, which was the ostensible purpose for his testimony, and it went so far as to discuss who people were, what their role in the organization was, specifically things like that Laureano was a leader, that another person was a— Did he have personal knowledge of these facts? There is no indication that he had personal knowledge of these facts. He himself, for example, with regard to the escort, interviewed the escort, who was not called as a witness. He discussed what he had been told out of court. In other instances, he just indicated that we have learned through our investigation that this person is called this and he is a leader or he is a trigger man, and it certainly was not personal knowledge. His personal knowledge would have been limited to what he could see on the videotape, but he went far, far beyond that. Well, he now was aware of what was on the videotape. He was personally present there for the 15 days. That's what the record shows. I'm sorry, I didn't— Could the question be repeated, Judge Torea? Yes. Was he personally on the scene for the 15 days when this was taking place? Yes, Your Honor, but personally on the scene, and he never said, I saw Christopher Laureano Perez engaged in criminal activity. But, so he was unable to say that based on anything that he had observed, and I'm sure if he had observed something like that, he would have testified about it. Instead, he testified about what we have learned through our investigation, which essentially means he's referring to undisclosed sources who are not in court, who could not be cross-examined, and because of that, we submit that it deprived Mr. Laureano of a fair trial to have that evidence, and we're also arguing cumulative error based on all of the improprieties we've raised. Now, there were three witnesses before he testified, right, correct? There were three more incidents? Three witnesses. There were three witnesses who testified about searches that did not involve Mr. Laureano Perez, that involved other defendants, and none of that evidence really had anything at all to do with my client, and again, that's why we submit that when the government somewhat broadly talks about the evidence against all of the defendants, I urge the court to look specifically at what the evidence was against each of them, and with regards to Mr. Laureano, there was no evidence about drugs or guns being found in any place that was connected to him, and so what those first three witnesses testified really had nothing to do with him. Agent James testified at the end of the trial. Yes. Was there anything he said that hadn't already been testified to? Absolutely, Your Honor. First of all, basically what he said was we have corroborated what the cooperating witnesses said through our intelligence, through other aspects of our investigation, so he basically assured the jury they could trust the cooperating witnesses, who, by the way, had made deals where they avoided potentially 80-year-long sentences and instead got five-year sentences, and they all had very surrealist backgrounds, and their testimony was not particularly direct when it came to how they knew what Mr. Laureano's role was. They basically said we understood he was a leader because that's what everyone said. None of them actually testified about any personal dealings with him. Agent James, however, said we established that he was a leader and we established this through our investigation, and our investigation corroborated the cooperating witnesses' testimony, so, in effect, everything that was missing from the government's case was supplied by this law enforcement officer who took it upon himself to, at great length, explain things that should never have been heard by the court because they weren't based on evidence that could be confronted in court. Okay. Let's go to the issue of the exclusion of the wife and the children. Are you objecting to the manner in which the wife was excluded? Yes. Well, Your Honor, we're objecting to the fact of the exclusion based on the case law from this court, from the Supreme Court, and it's pretty much been the law of this country since the Constitution, the right to a public trial, which includes the right to have people, your loved ones, present and attending, and this was during the testimony. Are you saying that the judge could exclude the wife because she was apparently signaling somebody? The court, in very limited circumstances, after following a procedure laid down by the Supreme Court in Waller v. Georgia, could have done that, but that's not what happened here. The Waller procedure requires that before there's any exclusion, the court first announce that it's doing it, that it gives the parties a chance to be heard on it, and even if the... Wait a minute. Let me just say something, because as I read the record, the judge took steps because he thought that the wife was signaling a witness or someone, excluded the wife, thereafter gave the opportunity to the lawyers to object to that procedure and told the client that the wife could come in, probably as she behaved, and there was no objection by anyone to that procedure. I agree there was no objection. However, it was brought to the court's attention the following day by the attorney. The correct procedure that... After the procedure is put in place, you make no objection, and now you feel that that is wrongful appeal? Well, at the time that the exclusion took place, the court... It was done without notice to the parties, so there was no opportunity to object. And that happened. At that point, there was all opportunity to object, but then the judge did give you the opportunity to object. That's correct, Your Honor, and I agree that this has to be considered either as plain error or as... I do disagree with the concept that it was waived by the lack of objection. I think... Also, I think a waiver would have to be made by the defendant himself and couldn't be inferred from silence. But I agree that after there was an opportunity to object and that was not taken, that does not change the fact that the court had already violated the Sixth Amendment rights as understood and as has long been the law under Presley and Waller v. Georgia and the other cases that we cited. Before a judge can take what the courts look upon as a very drastic action of excluding someone from a public trial, there must be an overriding interest. There clearly was an overriding interest. It wasn't an exclusion. It was a partial exclusion, if anything. Well, that's true, but the cases with regard to partial exclusion apply the same analysis and also say it is improper unless the judge makes a record, which he really didn't do until after the fact, and makes findings showing that there is no reasonable, less harsh alternative. Here we know there was an easier alternative because the next day he said to the wife, if you will comport yourself properly, you can remain in the courtroom. Obviously, had he said that the day before, the same thing could have happened, rather than saying I'm going to consider the alternative of asking you to remain still and act properly. I'm just going to have the court officers remove a loved one from the courtroom. I think under the case law that is a very clear violation of the Sixth Amendment. Putting aside the exclusion of the wife and just focusing on the exclusion of the children, the first exclusion, like the exclusion of the wife, is, as I read it, nominally based on a concern about disruption and managing the courtroom. They weren't behaving right. The going forward exclusion of the children, as I read it, the judge said this is no place for kids. So it's not a claim about disruption. It's just this claim that the children shouldn't be here for this kind of testimony. Is that how you understand it? It is, Your Honor, and we would take issue with that as a legal matter. That may be, but no issue was taken at the trial, nor was the objection raised when the opportunity was given to say, Judge, there really isn't a good reason to exclude children. And let's say that for the moment I agree with you that for it to be waived or you would have had to be expressed about the constitutional right being waived, and so we review it on claim error review. What would be your answer to this, which is, since there's no objection raised and there was disruption by the children to begin with, and now the judge is saying going forward I don't think they should be in the room, that that's all of a piece with management of the courtroom, that he's concerned that the kids will be disruptive, again, and that no one disabused the judge of that notion, no one objected to it, so that what we have is, as with the wife, in each case, the judge asserting courtroom management reasons for excluding somebody, no objection being made, and now on appeal, we're confronted with a claim that it's structural error and the whole trial has to be redone. Well, just to correct one point. The children were not removed because of any, there was never any suggestion that they were being disruptive. Well, that's what I guess I'm asking you. The initial record suggests that they were being disruptive, which is why the judge didn't want them in the courtroom. Then going forward, he also said that they should be excluded on the ground that this is no place for children. But what I'm asking is, if there was no objection to that, why wouldn't it be reasonable in plain error review for us to conclude that the judge was just making a continuing courtroom management decision that these kids are going to be disruptive and I don't want them there, to which you could have said that's ridiculous, there's no evidence of that keeping there, but no one did object. His reason, the only reason the judge ever gave for excluding the children, who were I believe 10 years old and 14 years old, was that children should not hear this kind of discussion. Counsel, somewhere in the record there is a flat statement that the children were being disruptive. I think we've exhausted this issue. Judge Torea, do you have further questions? No, you covered what I was going to cover too, so it's fine. All right, thank you. Good morning, Your Honors. My name is Karen Pickett. I represent the appellant Jeffrey Cummings-Aguirre. First I want to thank the counsel for my client's co-descendants. As I stated in my brief, I've joined them in their arguments, and I believe that they've argued them well, so I won't belabor the point. What I'd like to focus on today are two issues that are unique to Mr. Cummings-Aguirre. The first issue is the trial court's disqualification of his – I guess it wasn't his initial trial counsel because Mr. Cummings-Aguirre was first assigned a public defender, but Mr. Cummings-Aguirre hired a private counsel named Mr. Almenteros, who ultimately was disqualified by the trial court. And the second issue I'd like to get to today if I have time is the issue of the sufficiency of evidence that my client, Mr. Cummings-Aguirre, knew that the defile bag that contained the guns that were seized, that he knew two of the guns in that bag were machine guns as defined under the statute. On the first issue, the disqualification issue, Your Honors, under United States v. We, the right to select and be represented by one's preferred attorney is comprehended by the Sixth Amendment. As this court has said in the case of N. Ray Green jury proceedings, disqualification of counsel should be a measure of last resort. The government bears a heavy burden in demonstrating that disqualification is justified. I would suggest, Your Honors, that the record absolutely does not support that the disqualification of Mr. Almenteros was justified. Didn't the government call to defense counsel's attention and the court's attention that there were recordings from prison which suggested that your client's attorney had been paid for by the so-called leader of the conspiracy who was not then indicted but was an unindicted co-conspirator. And the government then raised the issue with the court of the potential conflict of interest between Christopher and your client's best interest. Your client's best interest, according to the government, were to provide information against Christopher and use it to get a plea bargain that would result in a great deal less imprisonment. The government properly brought that to the attention of the court and asked for a hearing. The court then held a hearing on those matters. The defense counsel, paid defense counsel, had in fact listened to one of the recordings and that was the basis for the government's motion. And your client, who was recorded, actually had to know of the content of the recordings. The district court then attempted to get information on the conflict of interest, which would have included getting information not just from the lawyer but from your client. And counsel absolutely refused. Refused to respond, claimed he had been given inadequate notice of this issue, and refused to let his client address the judge. And the judge says, well, that's another indication of conflict of interest. You are apparently advising your client not to answer my questions, but I don't know whether you're doing that on his behalf, your behalf, or Christopher's behalf. This is basically what happened, yes? Very much so, Your Honor, in certain aspects. But I would like to get to two aspects, a procedural aspect and a substantive aspect. On the procedural aspect, the government filed a motion which said we're inquiring into the source of the fees. In the motion, notably the government didn't mention the tape recordings, although it was close in time to the hearing that happened, and also acknowledged that Mr. Cummings could waive any conflict or serious risk of potential conflict of interest. That was the motion that was filed. There was a status conference, and the judge ordered the government to file an actual motion to disqualify counsel, and then for Mr. Cummings to respond. That motion was never filed. They come to court, and at the time, Mr. Almaterras had heard one of the tapes, but not the second. And so he felt that he was being blindsided, basically, that normally in a case where you're going to do something as significant as disqualify counsel, a motion would be filed, and you'd have the chance to respond to it. He had fair notice that disqualification was a possible outcome. So let's move beyond the procedure. So as to the substance, there's really, again, this is the government's burden. The government's burden is to present evidence that Mr. Almaterras needed to be- And what is our standard of review of the judge's decision to disqualify? Under the standard of review, it says that the judge has discretion whether or not- That's right. So our standard of review is the use of discretion. But I would argue, Your Honor, that the issue about disqualifying counsel, which is a Sixth Amendment issue, obviously the judge has to hear facts and make legal findings. And I would say the legal finding that there was a conflict or the serious risk of a potential conflict, it doesn't hold mustard. It wasn't there. And let me just explain why and the facts. If you review the transcripts of the jailhouse recordings, you'll see certain things. First of all was that Mr. Cummings said that he wanted to hire this lawyer. This was his previous lawyer. This lawyer had apparently done well in a previous criminal defense matter of his. And it's very clear that Mr. Cummings himself was seeking out- Okay. That's absolutely true. And normally you get your choice of counsel. But why does that show that there is no conflict of interest? Well, so the only potential conflict here is the payment of the attorney's fee- No, no. It is that your defendant is being represented by a lawyer whose loyalty is actually to Christopher and not to your defendant. And that forecloses your defendant from an option that is a fairly obvious option, which is provide testimony against Christopher. Well, on the issue of loyalty, the First Circuit has been clear in a couple cases cited in my brief that mere payment of attorney's fees by a third party- Oh, true. So the judge holds the hearing on it. And does he hear any argument that there is a waiver of conflict of interest? He says, I'm interested in hearing this. Tell me. And the response is, we're not going to tell you anything, Judge. Well, but again, it's the government's burden. And to get to the point where he finds a conflict of interest, he has to find more than that Mr. Loyola- Okay. Is it your position there was no potential conflict of interest at the point of the hearing? Not on the basis of the mere payment of fees, where Mr. Almateros had already represented Mr. Cummings successfully. Where it was the mere payment of fees. If you read the jailhouse transcript- Just so I understand, what's missing in your point of view? So I understood it was a payment of fees by a third party. Right. What do we know about the payor? Well, now we know he ended up being a co-defendant. What does the judge know at the time he decides to disqualify? He's told by the government that this is a potential target of the investigation. And apparently that Christopher Loreano- I'm not sure. I think they represent that he may be sort of the head of the organization. Okay. And so what's your argument why there's an abuse of discretion? What did the judge do wrong? Crediting that information? No, he did not credit that information. Okay. But again, the case file is very clear. I can read you the exact quote from- This is from the Bukalavas case. It says, he arranges where a third party pays- Well, I understand that, but you just said that he could credit the government's representation. He could credit the government's representation that the head of the organization may be paying his fees. And then what? That's an abuse of discretion for the judge to conclude that there's a conflict? Yes, it is. And why is that? Because that's a step beyond just- I'm not saying third party payment makes it a conflict, but when the payor is the head of the conspiracy in which the defendant is involved, and the judge then is worried that the defendant will be advised to make choices not for his own benefit, but for the benefit of the head of the conspiracy, including not cooperating, why isn't that enough to say that we should defer to the judge's discretion saying that's a conflict? Because the case law says that in a case where there's not multiple representation, that that risk isn't there. So, Mr. Altero is not representing Mr.- There's no finding that- I thought there was a third party payment case that we decided. What was the name of the case? Earth's Way or something like that? Eurotown? Eurotown. 564F3679. I thought was a third party payment case. Okay, well, I'm not familiar with that case, Your Honor, but there is a case where a co-perpetrator was paying the fees. He wasn't represented by the same attorney. I believe the case is familiar. And the court said that even if a co-perpetrator is paying the fees, that doesn't engender the risk because there's separate representation. It just puts it on the point about- So, just to understand your position a little bit, just the logic of that would be, in your view, the head of a conspiracy can pay the fees, and a district judge is never entitled to conclude that's a conflict? That's true because that happens in all sorts of cases. In white-collar cases, if you're representing an executive, based on a criminal investigation, the company's paying the fees. I've seen this a lot. I tell the client, the company's paying your fees. They're the target of the investigation. You've only got a little bit of time. Would you like to address your second issue? I would, thank you, Your Honor. The second issue is- I'll be brief on it. I'll leave it out in my brief. It's essentially the issue- the courts in the First Circuit and the Supreme Court have found that in order to convict somebody of possessing a machine gun, that person needs to know that that gun is, in fact, a machine gun. And there are ways of changing semi-automatic weapons to make the machine gun. Some ways, apparently, are visible to look, and some ways are internal. In this case, the evidence, essentially, is that in the time of seizure, and apparently nobody knew this was coming because people were flying all over the place, the officer comes in, gets a duffel bag, it's closed, there's four guns in it, two of which the government claims are machine guns, two of which aren't, as well as drugs. They pick up Mr. Cummings, he admits that he stored the duffel bag, and then he got $400 for it. He never says, I knew they were machine guns, I don't know whether they asked or not. And that's basically it. Oh, I'm sorry, there is one other point, which is that one of the cooperatives testified that he had seen Mr. Cummings using machine guns before. And wasn't there also testimony that these machine guns had visible markings on them so anyone familiar with guns would be able to say, yeah, they're machine guns, just by looking at them? I don't know anyone who knows, I don't know a lot about guns, so I don't know about that point, Your Honor, but it goes to sort of the case, the case that you wrote, which is sort of the flip side of this, which is the woman opens the bag, sees an AK-47, but just doesn't have any knowledge of what constitutes a machine gun. I would concede, I guess, that the government has some evidence that Mr. Cummings, if he knows what a machine gun is capable of, but there's no evidence in this bag that he knew that those guns had been altered, that he opened the bag. None of the cooperatives say that, you know, set it up to say, oh, we told him we were giving him machine guns. I mean, there's just simply no evidence. Okay, so the jury concluded otherwise. We take all inferences in favor of the jury verdict, and you're just saying the evidence isn't sufficient to permit a rational jury to draw this inference? I believe it really is based on conjecture, Your Honor, because there's just simply no evidence that my client knew what was in that bag. Could you say just a little bit about, I forget in the record what the cooperator's testimony is about the circumstances in which your client was supposedly using the machine gun? Sure. I don't know. I'm sorry I don't know the time. It was before my client was arrested, obviously, and apparently, and again, I don't understand guns, so I apologize, but apparently he and somebody else were out shooting in a barrel, and I guess from looking, you could tell that it was automatic fire as opposed to re-chambering and firing again, and that happened before, but there was no evidence. Do you know the time of when that happened? I'm not sure, Your Honor. And do we know who the other person he was with was? Was that a person who was in this conspiracy? He was in the conspiracy. I believe he was in the conspiracy. Judge Torea should be given the opportunity to ask some questions, so we'll do that now. Yes. On this last point, as I understand it, your argument is that he was handed a bag with a bunch of items in it, one of which the government proved contained two machine guns. As I understand your argument, there's no proof that he looked inside the bag? That's true, Your Honor. That's essentially my argument. And there was also no evidence that… Well, I haven't finished. Let me continue, because that's the argument. Isn't the government entitled to have the jury find from that circumstantial evidence that most likely he would look inside that bag? Well, I would argue, Your Honor, that that would still be conjecture. There would need to be some evidence that a co-conspirator said that this is what we generally do, or even more specifically, we know that he got this bag, or we set him up with this bag, and we always use machine guns. There really was nothing about that. Let me just add to something. I dissented by the way, but that's the law of the circuit. About maybe five, six years ago, as a rookie, something, the name, a similar situation occurred with a briefcase containing diamonds. And we know that that was sufficient to establish knowledge by the defendant of the contents of that briefcase. Are you familiar with that case? I'm sorry, Your Honor, I'm not familiar with it. I'm certainly happy to look it up and respond in writing as to why that case may be different. I don't know if under the statute there's a specific requirement that the person knew it was diamonds, but obviously that is a specific requirement. Now remember, being convicted of possessing this machine gun on a knowing basis gave Mr. Cummings an additional 30 years. Well, let's not go into that right now. The fact is that there is evidence that he knew what machine guns were like. I mean, is there evidence about that, that he had used machine guns? Yes, there is. So the jury has evidence that if he looked at it, he would know that it was a machine gun? I suppose the issue is if he looked at it, which there is no evidence that he didn't look at it. I mean, the jury would have to assume that, and I'm not saying that... I mean, it wouldn't be very much of a stretch if you handed that bag to look to see what's inside so you know what you're having custody of. I would argue, Yaron, that's not necessarily the case. But, you know, especially in these direct conspiracies, this was just sort of a flophouse, I guess I would say, and people were storing things everywhere. He happened to have, you know, his name and some documents in the place. But there really was no evidence of the handoff or that he knew specifically what was in there. And I would argue that that's important in a situation where knowledge is required and the sentence is enhanced by 30 years. And, Yaron, just briefly, my client did ask me to point out to the court, which I know that it will, that if he did raise some arguments on his own, and I told him that the court... Yes, we've read the pro se brief. Thank you, Your Honor. Just a moment. Judge Torea, do you have anything further? No, thank you. Thank you, Your Honor. Okay, thank you. Okay, we'll hear from the government. Good morning, Your Honors. May it please the Court. Sonya Ralston for the United States. I'd like to begin by clearing up seven matters about the record and then responding to the arguments. I'm going in order as we heard them this morning. The first issue is about whether the judge was biased against Juan, and defense counsel said that the witness was afraid to testify in front of the judge. That's not true. The only thing expressed on the record is a fear of the agent. That's at the June 10th transcript, page 15. In fact, they asked for an in-camera hearing in front of the judge by himself. So there's no evidence that anyone was afraid of the judge. The next thing is about the rounds and whether they were connected to the drug conspiracy. Point out first that there was no 403 objection made at trial, and also that in the June 12th transcript at pages 50 to 52, which is also recounted in our brief at page 38, you can see an explanation of the confusion that ensued about things not related to drugs or other than drugs and how it then progresses to the rounds and not related to drugs was about a construction business. The next thing is about whether there was an objection to Agent James' testimony, and it is Agent David James. At one point, counsel said Agent Adams. There is no Agent Adams in this case. This occurs in the June 13th transcript at pages 91 and 92. On page 92, where an objection would occur if there had been one, there is not one. This is reviewed only for plain error. The next thing is about whether there was a finding that the children were disrupting. This is in the June 11th transcript at page 4. The district court says, and I quote, the children were disrupting a little bit. So that is a finding on the record. Next, there is a question about during the disqualification of counsel, whether the government proffered that Christopher was the leader of the conspiracy. This is at the Cummings and Villa appendix, page 80. This happened, and the court says that it understands that that is the proffer. On the sufficiency issue, to clarify, count 5, which is the one that was initially challenged in the brief, possession of a machine gun, has assessed for a max of 10 years. It's the possession of a machine gun in furtherance of drug traffic in conspiracy, count 6, that has the 30-year mandatory minimum. And the question about whether he was seen testing the guns, that's on the June 10th transcript, pages 40 to 41. Mr. Rivas says that he saw Mr. Cummings and Juan firing automatic pistols into a bucket at a hill behind the housing development in a parking lot. Okay, with that matters cleared up, I'd like to start with the overview testimony issue. I think the most important thing here is that this case is really like others where this court, especially recently, has found no error. This officer, Officer Vasquez, and that's where I want to focus, was the lead officer, the lead investigator from the Commonwealth side in this investigation. He's personally present when these surveillance videos are taken. The bulk of his testimony is about the videos. He authenticates them, they're introduced, they're played.  So if you pay attention, you can see here that they're passing something. And it's very similar to other cases. For example, what happened in the Flores de Jesus case, the defendants rely on that significantly, but if you read it closely, the court actually says it's okay. The majority of the testimony the officer gave there was fine, and it's things like this, identifying where the point was, looking at a map and pointing it out, showing people the layout, explaining how they used this confidential informant, authenticating the tapes, saying that they showed drug deals, things like that. That's the bulk of Agent Vasquez's testimony, Officer Vasquez. When you say the bulk, does that mean that there were certain statements that you can see did go too far, like the trigger man? I don't, and I want to turn to that next. So those statements come out in the rebuttal testimony, and I think this is important. On cross-examination, Christopher's counsel tried to challenge Agent Vasquez's testimony. So there's a video of a funeral showing Miguel, who was one of the leaders of the organization, with Christopher. Miguel gets shot. He's being buried. There's a video of this burial where the defendants and a bunch of the other co-conspirators show up in matching shirts that are showing support. And on direct, what happens is the video gets introduced, authenticated. He says, yes, that's Christopher, that's Antero, that's Falchi, and essentially that's it. They're wearing shirts. They're at the funeral of Miguel. That's about it. On cross, then Christopher's attorney goes into, you know, who's Antero? I want to know, who is Antero? And he asks these very open-ended questions. And after being warned by the court that asking these questions opens the door into all of this evidence about Antero and the guns that he was carrying, the fact that they're automatic weapons or AK-47s, and his role in protecting Christopher. So it's on cross that this comes out at first. There's no objection to the answer that's given is not responsive to the question. It's completely responsive. They elicit it first. After it's elicited on cross, and they're trying to show that Antero is a licensed private investigator and that he's somehow above board. There's a whole bench conference sidebar about this that I think is very interesting where the court, at length, warns defense counsel about opening the door. Then on redirect, the government says, going back into video, explain to us what happened. And they're talking about the intervention that was done that same day. So, again, this is personal knowledge. And we're looking at, you know, he does say, according to my investigation. But that's on the same page where he said, that day, we stopped these defendants and, you know, arrested them. This is what they had on them. This is how they were traveling together. This is how they were standing. You know, Christopher didn't have guns, but he was surrounded by these other people who did have guns. He talked about what the guns were. And he identified Antero as a bodyguard and Salchi as a triggerman. But also of note there is that when this court has said it's impermissible for an agent to identify the roles of someone in the conspiracy, the person it's impermissible to identify the role of is the defendant. Salchi and Antero are not defendants in this case. They've already pleaded guilty at this point. They're not going to trial. They're not in front of the jury. There is no case that this court has found improper overview testimony where the agent identified the role of someone in the organization where that someone is not a defendant. So the only thing that could possibly be trouble here is that he calls Christopher the leader. This happens from both Rivas and Diaz over and over and over again. It's clear from this video where he's being surrounded by the people carrying the guns. It's clear from the conversations that are on the phone calls. So if that one statement is error, it's harmless. And it's, by the way, their burden to prove plain error at this point because they didn't object. And on the plain error point, I'd like to go through quickly a little bit of the evidence just to help this court, the evidence against Christopher. So in addition to all of the videos, including the one of the funeral that shows him surrounded by the bodyguards with guns, we have both Diaz and Rivas, the two cooperating witnesses, who talk at length about the different types of drugs that are sold at the point and who owns the different things. Christopher owns, in fact, most of them. Miguel owns some of them. This other guy, Menor, owns some of them. Notably, on the June 12 transcript at page 30, Mr. Diaz says, Christopher was the boss. He's the one who gave me the first job. So that's not just somebody speculating that he's the head honcho. He's saying, this is the guy who hired me in the first place. You have the testimony of Mr. Diaz when he's talking about the incidents in the rounds where he's saying, Christopher was the one who gave me the orders. Christopher said, go get the car. Christopher said, do this. And I think all of this, the fact that Christopher is the one who gets shot at by the rival gang, and they talk about that in the phone calls, they talk about that. Rivas says they're going to war. So there's ample evidence that Christopher was the leader of this organization. And I'd like to focus for a little bit on the phone calls. This is something the defendants don't want you to think about. But these two phone calls that are in the transcripts related to the challenge about Mr. Cummings' lawyer were also played at trial. And those phone calls are condemning. They show the defendants in their own words talking about silencing cooperating witnesses, about intimidating people's families, about keeping the war going on, about there were traitors who knew it was going to happen before you got shot at with your kids in the car, about get me a lawyer, about staying united. All of these things in those calls are damning evidence. The jury heard them, and that's the defendants in their own words. I think that's, in some ways, that and then the cache of drugs and guns that are introduced in the first three witnesses before Officer Vasquez testifies is the strongest evidence in this case. I'd like to talk about the closed courtroom issue. There was a lot of discussion during defendants' argument about whether this is waiver or plain error. The Christie case could not be clearer. This is waiver. The case explicitly distinguishes plain error. If all counsel had done was stand by, then it would be reviewed for plain error. It's not. What happened in that case... Go ahead with the facts in that case, yeah. I mean, what happened there was exactly what happened here. There had been someone excluded from the courtroom the day before. The next day, it's brought to the attention of the court. The prosecutor brings it to the court's attention and says, I want it to be on the record that this happened. And the court says, yes, I understand. Thank you for bringing it up. They talk for several pages. And the defense counsel who's there doesn't object, doesn't say anything, doesn't move from this trial. In that case, don't they specifically raise the constitutional right? Isn't there an express reference to the constitutional right, not just to the fact that someone was excluded? I thought in that case it was put in terms of the constitutional right to a public trial. There's no reference here to it. That's what I'm just worried about. Normally, when you waive a constitutional right, you actually waive the constitutional right. You don't just fail to object to a practice. So I didn't give anything that makes this case stronger. Okay, how come? Because in that case, the counsel was on notice that, hey, there might be a Sixth Amendment problem here, and still said nothing. That's why it was waived there. Yes. So here, it wasn't put in those terms. That's why I'm concerned about saying it's waiver as opposed to plain error. Because ordinarily, with constitutional objections, if you just didn't make an objection, like a confrontation clause, right, we don't say it's waiver. So I'm trying to figure out what about this would make it actually waiver if no one ever talked about it in constitutional terms below. So I think the point is that the point in Christie that the court makes is that not about whether it's the Sixth Amendment. It's the fact that the facts were being discussed. It was on the table, the court said. And once it's on the table. But what was on the table in Christie? Justice Souter wrote the opinion, I believe. That's correct. In Christie, what they mentioned specifically, I think it's the Sixth Amendment right or whatever the public trial right is, in constitutional terms. Okay? So that that did not happen here. Just like in ordinary plain error review, we don't treat it as waiver just when you don't raise something. Now, maybe you could say why on plain error you win anything. Sometimes counsel use shorthand terms without a direct reference to the Sixth Amendment closing the courtroom. Well, I mean, I guess the question would be is the position of the government any time there's an exclusion that's identified if you don't object it's waiver? I think if it's discussed on the record and you don't object, ask for clarification, ask for findings under Waller or Pressley or move for a mistrial, it's waived. I think that's what Christie says. That's a first order matter. I think there's a second order matter, which is under DeLuca, that this isn't even a closure. If you look at Scott and DeLuca, ordinary courtroom management where you're removing disruptive individuals from the court or you're just doing security, that's not closure. That doesn't even get to a partial closure. How does that fit, just to play it off for me, how does that fit with the exclusion of the children going forward? Because that doesn't seem to be management of the courtroom. He doesn't think they should be subjected to this. That seems a little bit different. It does seem a little bit different, but I think there's several reasons why it's not a problem. The first is that in Waller, the Supreme Court says there are three reasons why the public trial right is important, that it's to keep the government and the court on their toes, it's to prevent perjury, and it's to allow witnesses to come forward if the information is made public about what the charges are. There's no reason to think that the presence of minors in the courtroom is going to impact those three things. But that's the position. The government doesn't want to take the position that you can have a general rule that your family, your children can't be in the courtroom? Depending on the subject matter of the trial, I think it's completely within the district court's discretion. Imagine a case, this one, where there's a discussion of a great deal of violence, if you talk about a child pornography case or an exploitation case, there are, I think, good reasons why a court in its discretion would say that this is not a place for children. And there's no case that's ever said... If we did it on plenary review, is there any other argument that you have as to why this wouldn't have been a problem to removing the children? Is there a way we could construe this as the reason he excluded them was to facilitate the concern about disruption of the children that he had earlier identified? Absolutely. So he does identify, he makes findings that the children were disrupting. There's no reason to think that that concern has dissipated or gone away. There's no assurance that, oh, no, they're on their best behavior today or something like that. There's also no prejudice that can be said, and that's part of plenary review. The defendants have to show prejudice. If you look at the Purvis v. Crosby case, I know it's out of the 11th Circuit, but there's no case in this courtroom saying that even a partial closure doesn't involve prejudice review. So I think, as with all plenary, they have to show an effect on their substantial rights. I don't see how the children in the courtroom were going to change anything. They haven't mentioned anything in their brief. Their whole argument is structural error, which is premised on a complete misreading of this court's cases. The court, even if you're looking at a partial closure, made adequate findings about the disruption and the witness intimidation and that there aren't reasonable alternatives. You know, it seems this happens in the middle of day four, apparently, because it's brought up at the beginning of day five. It seems from the record, although it's unclear, they talk about it as though the wife, at least, had been there previously. So there's no reason to think that it would have been any different going forward. I think the court is well within its discretion to manage its own courtroom, to keep things at the level of decorum that's appropriate in a federal proceeding, especially a serious one like this. There was discussion about the district court's so-called vouching of the witnesses. I think the only thing they mentioned today, which is the only thing I'll rebut at this point, is that the instructions the district court gave were not curative. But the instructions here are almost identical to what happened in Melendez-Rivas, where this court found that an instruction that the jury, quote, could disregard, quote, quote, is sufficient. So that's essentially what the court said here. He said that you are at liberty to disregard any question, any comments that I may have made. So that's essentially the same instruction. There's no reason to think those instructions weren't curative. There was discussion about the rounds, the kidnappings, and whether that's relevant. The relevance 401 objection was preserved. The 403 prejudice objection was not. And the 401 relevance is a very low bar. Mr. Diaz says that they go out on these rounds because Christopher gives the orders. He's in Cummings' power. Juan is there, and he's armed. That shows the relationship among these parties. It shows the hierarchy of this conspiracy. Those are all things alleged in the indictment. And as this court said in Rivera-Calderon, anything alleged in the indictment in a conspiracy case, the means and manner, or the overt act, can come in as relevant. So I don't see how this isn't relevant. It's a very low bar. I don't believe I have anything else unless the court has questions. Yeah, I do. On the disqualification of counsel, what significance do you give the later attempt by the defendant to, per se, inform the court that he's willing to waive any conflict of interest by his former counsel? So this letter is sent November 28th, so three and a half months after this hearing has been held. At the hearing, the court is very clear about the kind of policy that needs to happen, about informing the defendant about the source, that he still needs this information about exactly where the fees are coming from. And also, this is immediately after the superseding indictment has been issued. So now Christopher is alleged in the conspiracy as the ringleader. So nothing about the facts has changed. The facts have, in fact, gotten worse. The conflict that was a potential conflict is now on the verge of being an actual conflict. And the letter doesn't do anything to dispel any of that. He was in court when the court was asking all these questions, and his letter doesn't address any of those questions. It doesn't say, yes, you're right, Christopher's paying my fee, and here's why I don't think it's a conflict, or here's why I waive and I'm willing to go forward with this. There's no informed waiver. He doesn't say, I want to come back before the court and now answer those questions that the court was asking me before. It's very sparse. There's nothing in there. And I don't see why that's an abuse of discretion for the court to say, we've had this conversation, you didn't want to cooperate, and it's been decided. So, again, the standard review is abuse of discretion. Let's see if Judge Torea has some questions for you. Judge Torea? Yes. I've been trying to find the exact name and citation of this case. Ivy Wilkie or something like that. Are you familiar with that case? This is the one about the Dinans? Yes. I am not. I'm sorry, Your Honor. I am, because I think I wrote the majority decision and you dissented. Yes, right. As I recall, that case we held, the majority held that the fact that the defendant had possession of this briefcase full of diamonds, the jury was entitled to conclude that he knew what was inside. I believe that's correct. I can read you the passage of it. Sure. Please do. The jury could infer that Ivy Wilkie had knowledge of the contents of the briefcase, given his close association and familiarity with the two co-conspirators. The jury could have inferred that the co-conspirators knew the contents of the briefcase from their organizational role in the conspiracy and their direct relationship with another member, and that their relationship with Ivy Wilkie led them to inform him of the contents. Yes, that's the case. All right. That sounds like this case. No, you did not write it. I did not write it. I was in the majority. Another case that I think is helpful is the Jambro case. You know what? You were not. No? No. My memory is fading. Too many cases. Judge Torea, any further questions? There's something that is greater than error, which has not been discussed, and that is the violation of the Speed Trial Act. Okay. My calculations come to a total of 183 days from the indictment, which may mean that there are 92 not accruable days, which is 22 more than permitted. Do you agree with that? I do not agree with that. I'd be happy to talk about the details if we can nail down specific periods, but I'd like to point out, first of all, that if you're counting from the indictment, then I think we should be counting from the arraignment, which happened after, and it's the later occurring of the two that starts the clock. Okay. There was a dismissal without prejudice, and then there was a new indictment, so it's probably harmless anyway. Yes, we say it's harmless anyway. He was convicted on a superseding indictment, and so if the remedy would have been dismissal without prejudice, it doesn't matter. Thank you. Thank you, counsel. Thank you, Your Honor. Thank you.